Filed 4/22/25  Central Delta Water Agency v. Cal. Dept. of Water Resources CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CENTRAL DELTA WATER AGENCY, <br><br> Petitioner and Appellant, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF WATER RESOURCES, <br><br> Respondent; <br><br> ECOSYSTEM INVESTMENT PARTNERS, LLC, <br><br> Real Party in Interest and Respondent. | A167384 <br><br> (Contra Costa County Super. Ct. No. MSN210558, MSN210560) |

After preparing an environmental impact report (EIR) and holding a public hearing, the California Department of Water Resources (Department) approved a tidal restoration project proposed by real party in interest, Ecosystem Investment Partners, LLC (Ecosystem).[1]  Petitioner and appellant Central Delta Water Agency (appellant), along with three others, challenged the environmental review by filing petitions for writ of mandate in the trial

---

[1] We refer to Ecosystem and the Department, collectively, as "respondents."

1

court. After issuing a 31-page statement of decision, the trial court entered a judgment granting in part and denying in part the petitions. Only appellant appeals. Appellant attacks the portion of the judgment denying it relief on the ground that the EIR was invalid under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[2] (CEQA), because it failed to adequately analyze the project's impacts on hydrology and water quality. We affirm.

## BACKGROUND

### The Project

The Lookout Slough Tidal Habitat Restoration and Flood Improvement Project (project) seeks to restore approximately 3,164 acres of tidal wetlands in the Cache Slough region of the Sacramento-San Joaquin Delta (Delta), while also widening a portion of the Yolo Bypass to reduce flood risk. The project would be designed and constructed by Ecosystem on land owned by the Department and located mostly in unincorporated southeastern Solano County, with a small portion extending into Yolo County.

The project is intended to satisfy the Department's tidal habitat restoration obligations under the United States Fish and Wildlife Biological Opinion for the Reinitiation of Consultation on the Coordinated Operations of the Central Valley Project and the State Water Project. The project also is consistent with the National Marine Fisheries Service Salmonid Biological Opinion for Long-Term Coordinated Operations of the Central Valley Project and the State Water Project. Once completed, the project will create habitat for Delta Smelt, longfin smelt, steelhead, salmon, sturgeon, giant garter snake, and other species.

---

[2] All further statutory references are to CEQA provisions as codified in Public Resources Code sections 21000–21177, unless otherwise indicated.

Additionally, the project is designed to meet regional flood protection objectives. The project involves construction of a new setback levee along the west and north edges of the project site to allow for breaching the existing Yolo Bypass West Levee along Shag Slough. This new setback levee will provide 100-year flood protection with additional height for climate change and sea level rise resiliency. Breaching and degrading the existing levees will restore historical tidal influence on the site, providing food web and other benefits to Delta smelt and increasing seasonal floodplain rearing habitat for salmonids. Further, revegetation would be used to restore and enhance upland, tidal, subtidal, and floodplain habitat.

**The EIR**

In December 2019, the Department, acting as lead agency, circulated the draft environmental impact report (DEIR) for the project. The DEIR included a description of the project generally as set out above. The DEIR analyzed potential impacts to agriculture and forestry, air quality, biological and cultural resources, hydrology and water quality, and more. The DEIR determined that the impacts would either be not significant, less than significant, or less than significant with mitigation.

The Department received 19 letters with comments on the DEIR from various public agencies, including appellant. Appellant argued among other things that the DEIR failed to properly analyze the project's individual and cumulative impacts on salinity. Comments from other agencies asserted that the DEIR failed to disclose or analyze the project's impacts on harmful algal blooms.

On January 22, 2020, a public hearing regarding the adequacy of the DEIR was held. On October 23, the Department published its responses to the public comments, which, together with the DEIR, made up the final EIR

3

(FEIR).[3]  And on November 2, the Department certified that the FEIR complied with CEQA and that it reflected its independent judgment, and approved the project.

**The Proceedings Below**

In December 2020, four separate groups of petitioners—appellant, Solano County Water Agency, Reclamation Districts 2060 and 2068, and the City of Vallejo—filed in separate cases in the Solano County Superior Court separate petitions for writ of mandate challenging the project under CEQA. These petitions were transferred to the Contra Costa County Superior Court, and the cases were consolidated and designated as complex.

On November 18, 2022, after receiving briefs filed jointly by all petitioners and briefs filed jointly by the Department and Ecosystem , and hearing oral argument , the trial court issued a 31-page statement of decision rejecting all but one of the petitioners' claims—it found that the portion of the EIR describing the project's impact on opportunities for fishing from the shoreline was inadequate under CEQA.

On January 5, 2023, the trial court entered a judgment granting in part the petitions "as to the EIR's failure to adequately disclose, analyze[,] and/or mitigate the project's potentially significant impact on recreational opportunities to fish from the shoreline," but denying the petitions in all other respects.  On the same day, the trial court issued a peremptory writ of mandate directing the Department to file a return setting forth all actions taken to comply with the writ.

---

[3] We will hereafter refer to the DEIR and the FEIR collectively as the EIR, except where differentiation between the two reports is required.

On March 3, only appellant appealed from the judgment.[4]

## DISCUSSION

### CEQA Overview and Standards of Review

In *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700 (*Tiburon Open Space*), we provided an overview of CEQA and the standards of judicial review. We quote it here at length:

"As a general proposition, CEQA depends on the EIR. 'An environmental impact report is an informational document,' the purpose of which 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (. . . § 21061.) According to our Supreme Court: 'The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting " 'not only the environment but also informed self-government.' " [Citation.] The EIR is the heart of CEQA, and the mitigation and alternatives discussion forms the core of [an] EIR.' (*In re Bay–Delta Etc.* (2008) 43 Cal.4th 1143, 1162.)

" 'A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. (. . . §§ 21100, subd. (a), 21151, subd.

---

[4] Subsequently, the Department filed a return to the peremptory writ of mandate, stating it had revised the FEIR in accordance with the writ's directives. On December 27, the trial court issued an order discharging the writ, finding that the Department's determination that the project would not have a significant impact on recreational opportunities to fish was supported by substantial evidence.

5

(a); Guidelines,[5] § 15064, subd. (a)(1).)  The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements.  (. . . §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.)' " (*Tiburon Open Space, supra,* 78 Cal.App.5th at p.725.)

"Too much should not be expected of an EIR.  It is not to have the exhaustive scope of a scientific textbook.  'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.  An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible.  Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts.  The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)

"Much of what goes into an EIR is left to the discretion of the agency preparing it.  The leading treatise summarizes:  'The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research.  [Citations.]  An EIR is not required to address all of the variations of the issues presented.  [Citation.]  An analysis of every

---

5 "Guidelines" refer to the Guidelines for Implementation of CEQA, which are found in the California Code of Regulations, title 14, section 15000 et seq.  All subsequent citations to the Guidelines are to title 14 of the California Code of Regulations.

permutation of the data is not required.' (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont. Ed. Bar 2d ed. 2022) § 11.28, pp. 11–19 to 11–20 (Practice Under the California Environmental Quality Act); *see Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*) ["A project opponent . . . can always imagine some additional study or analysis that might provide helpful information.  It is not for them to design the EIR.  That further study . . . might be helpful does not make it necessary'].)" (*Tiburon Open Space, supra,* 78 Cal.App.5th at p. 726.)

"The scope of judicial scrutiny proceeds along two paths.  ' "Section 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion.  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'  As a result of this standard, 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]"  [Citations.]  "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable."  [Citation.]  [¶]  "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo."  [Citation.]'  (*In re Bay–Delta Etc., supra,* 43 Cal.4th 1143, 1161–1162.)

" 'The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's

7

determinations and resolve all conflicts in the evidence in favor of the agency's decision. . . ." (*Tiburon Open Space, supra,* 78 Cal.App.5th at p. 727.)  " 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task is "not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club v. County of Fresno* (2018) 6 Cal. 5th 502, 512.)

"Every court 'presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.) Conversely, courts refuse to presume administrative error, still less that it is prejudicial.  (§ 21005, subd. (b).)  In fact, 'errors in the CEQA . . . process which are insubstantial or de minimis are not prejudicial.' (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 486; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 ['Insubstantial or merely technical omissions are not grounds for relief'].)

"Legal error, in the form of failure to comply with CEQA, is reviewed independently, but all factual determinations are reviewed according to the substantial evidence standard.  'The substantial evidence standard is applied to conclusions, findings and determinations.  It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions.' (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)

"But a substantial evidence challenge is subject to an important proviso: 'As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.' (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266; accord, *Sierra Club v. City of Orange, supra,* 163 Cal.App.4th 523, 547.)" (*Tiburon Open Space, supra,* 78 Cal.App.5th at p. 728.)

**Introduction, and Some Comments on the Briefing**

Before we discuss appellant's contentions on appeal, we pause to make note of deficiencies in its briefing.

First, appellant's opening brief raises multiple arguments but often fails to support them with meaningful legal analysis. It is well established that "[i]n order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.) Further, "[m]ere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) Many of appellant's arguments violate these principles. As a result, appellant fails to make clear the nature or scope of those arguments. It is not this court's obligation to make arguments for appellant or speculate about which issues appellant's counsel intended to raise. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) For any argument that appellant asserts without supporting cogent argument or authority, we

9

may treat the argument as waived and decline to consider it. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*); *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).) Notwithstanding these shortcomings, we will address the arguments for which we can discern a legal or factual basis in the briefs. (See *United Grand Corp. v. Malibu Hillbillies, LLC*, *supra*, 36 Cal.App.5th at p. 153.)

Second, as respondents observe in their joint respondents' brief, for many of appellant's contentions challenging the evidentiary sufficiency of the EIR, appellant fails to make a fair statement of the evidence, presenting only the evidence favorable to it. This violates the principles governing substantial evidence review that we stated above. In challenging the EIR for insufficient evidence, appellant bears the burden to set forth *all* material evidence and show why it is lacking. (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 728.) By presenting a one-sided version of the evidence, appellant fails to meet this burden. (*Ibid.*) We are not required to make up for appellant's failure to carry this burden by independently sifting through the record, which in this case includes at least 1,372 pages of the DEIR and FEIR, exclusive of the multiple attachments and appendices to each. (*Ibid.*; see *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 113 ["We are a busy court which 'cannot be expected to search through a voluminous record to discover evidence on a point raised by [a party] when his brief makes no reference to the pages where the evidence on the point can be found in the record.' "].)

Finally, appellant's briefing largely rehashes the same arguments that it raised in, and were rejected by, the trial court. In its reply brief, it dismisses the trial court's decision as "irrelevant," since, as noted above, on appeal we review "the agency's action, not the trial court's decision."

(*Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 727.)  While our review is de novo, this does not mean the trial court's decision is "irrelevant."  Once a trial court has produced a written decision that is obviously the result of considerable labor, it is only fitting that respectful attention be given to those labors.  (Cf. *Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 791 ["The fact that we review de novo . . . does not mean that the trial court is a potted plant in that process"]; *Koster v. County of San Joaquin* (1996) 47 Cal.App.4th 29, 45 ["Although we often exercise de novo review in CEQA cases, in many such cases, trial courts provide us with a thorough written opinion which helps to clarify issues for appeal"].)  Counsel is certainly at liberty to argue that the trial court committed an error of law, or determined an issue of fact that lacks the support of substantial evidence.  But to totally ignore, as appellant does here, the particulars of the trial court's comprehensive decision is hardly a promising stratagem.

We turn now to appellant's arguments, which broadly assert that the EIR failed to adequately analyze the project's impacts on harmful algal blooms, water salinity, and water quality.

**Harmful Algal Blooms (HABs)**

***The EIR Analyzed the Project's Impacts on HABs***

Appellant's first argument is that the EIR "failed to analyze the potential of the project to induce HABs" formation.  (Capitalization omitted.)  We disagree.

**Additional Background**

The DEIR discussed the environmental setting of the project, including the quality of the surface water in the project site.  This discussion includes a subsection entitled, "Turbidity," which, in the first paragraph, discusses turbidity, "a measure of the amount of suspended solids within the water column."  "Turbidity is correlated to the input of nutrients and other

11

constituents that are adsorbed to particles within the water column." "These adsorbed constituents on suspended sediment can be residual pesticides, herbicides, and other contaminants from upstream agricultural, industrial, and municipal land uses. Turbidity is an important measure of the load of sediment within the Delta and is often used in combination with other measurements to indicate water quality relative beneficial uses of water."

The second paragraph under "Turbidity" is where HABs are mentioned. It states: "Nutrients, primarily nitrogen compounds (N) and phosphorus (P), may trigger excessive growth of algae or toxic blue-green cyanobacteria. Primary sources of nutrients are erosion, agricultural runoff, urban runoff, and treated effluent. The emergence of increased concentrations of harmful algae blooms is indicative of potential problems with water stagnation, nutrient loading, and temperature increase. The cyanobacterium *Microcystis* aeruginosa has been an increasing component of summer harmful algal blooms in the Delta." (Fn. omitted.)[6]

Elsewhere, the DEIR analyzed the project's impacts on turbidity, finding the impacts were less than significant with mitigation measures during construction activities, and less than significant during post-construction activities. The DEIR also analyzed the project's impacts on

_____

[6] Because the EIR explains that the turbidity and nutrients are related to each other, it often discussed them together. Respondents also do so in their brief. In its reply brief, appellant criticizes this "combined" approach in the EIR. But because it did not raise this contention in its opening brief, it is forfeited. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 559 (*Golden Door*).) In any event, the public comments that appellant cites to in its reply brief do not support its claim that it is inappropriate to address nutrients and turbidity together when discussing HABs. Indeed, appellant acknowledges that "[t]he DEIR correctly notes that turbidity is related to the input of nutrients."

12

water temperature, salinity, and residence or exposure times (which, as later clarified by the FEIR, are factors in addition to turbidity and nutrients that may lead to the formation of HABs).  The DEIR determined the impacts with respect to these factors would be less than significant.  These discussions were not made within the specific context of HABs.

In response to the DEIR, the Department received public comments stating that "[t]he DEIR fails to disclose or analyze the Project's HABs impacts.  The DEIR only discloses the potential for proliferation of HABs in the context of increased turbidity."  Citing to a scientific report, the commenter stated that "turbidity is only one of at least five major factors triggering HABs in the Delta environment where the Project is proposed."  The other factors noted were water temperature, residence times, nutrient availability, and salinity.

The Department responded to these comments in the FEIR.  It stated it "agrees with commenters that the control of invasive species and harmful algal blooms (HABs) is important to the long-term success of the . . . Project.  Invasive species control, monitoring, adaptive management, and long-term management actions are included as part of the Proposed Project.  It is expected that the Proposed Project will reduce overall cover of invasive species within the Proposed Project Site, resulting in improvements to water quality and habitat integrity."

The FEIR included additional analysis in a section entitled, "Harmful Algal Blooms (HAB)," which stated:  "Several comments were received regarding the adequate analysis of water quality impacts associated with the proliferation of HABs.  The Proposed Project will not create conditions that would give rise to HABs with regard to environmental factors including turbidity, salinity, temperature, or nutrients that would trigger the

13

emergence and subsequent growth of HABs. The potential contribution of turbidity and nutrients related to water quality and algal blooms is discussed in Section IV.G *Hydrology and Water Quality*, of the DEIR, pages IV.G-4, IV.G-21, and IV.G-22. With regards to temperature, as stated on page IV.G-28: 'Temperature decreases associated with marsh vegetation shading are therefore anticipated to roughly offset or decrease temperature increases associated with solar radiation due to shallow depth. Accordingly, changes to water temperature would be minimal and would not impact in-Delta water temperature criteria. Therefore, impacts would be less than significant.' Thus, the Proposed Project would have minimal effect on water temperature that may influence the presence of HABs. With regards to salinity, as stated on page IV.G-23 through IV.G-25, the Proposed Project would not result in substantial adverse effects on the beneficial use of Delta waters as drinking water or exceed the applicable threshold of significance for agricultural operations or fish and wildlife populations post-construction. With regard to nutrients, current farming practices, under baseline conditions, use pesticides and fertilizers that can contribute residual levels of chemicals in irrigation and other site runoff which can adversely affect receiving water quality. Such practices would end prior to construction of the Proposed Project, decreasing potential inputs that might contribute to water quality issues over time as part of the cumulative scenario. Additionally, the emergence of increased concentrations of HABs is indicative of potential problems with water stagnation. The Proposed Project would reintroduce tidal influence to the Project Site, reducing water stagnation. Therefore, the Proposed Project is expected to have a positive influence on water quality by eliminating agricultural inputs that contribute to HABs and other aquatic invasive species. Thus, impacts to water quality would be less than

14

significant."

**Analysis**

As mentioned, among other requirements, the EIR must identify and analyze the significant effects on the environment and state how those impacts can be mitigated or avoided. (*Tiburon Open Space*, *supra*, 78 Cal.App.5th at pp. 724–725; citing §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.) A "significant effect on the environment" means ' " 'a substantial, or potentially substantial, adverse change in . . . the environment.' " ' (. . . § 21068; see also Guidelines, § 15382.) " ' "Environment" means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' (. . . § 21060.5; see also Guidelines, § 15360.)" (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473.)

"Under the substantial evidence standard, the 'question is whether [the District] reasonably and in good faith discussed [HABs] in detail sufficient for the public to discern from the [ ]EIR the "analytic route the . . . agency traveled from evidence to action." ' [Citation.] Where, as here, ' " 'the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion.' " ' " (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 637 (*North Coast Rivers*); Guidelines, § 15128.)

Appellant contends that the EIR failed to analyze the project's impact on HABs in general. Appellant acknowledges the FEIR's conclusion that the project's "effects on . . . temperature, salinity, nutrients and other measures of water quality supported the EIR's finding of no impact on the proliferation of HABs." However, appellant contends that "contrary to the FEIR's claim,

15

these 'analyses' did not actually analyze the project's HABs impacts at all' instead, these analyses were used to determine whether *other water quality standards* would be violated." This argument lacks merit.

Appellant's argument relies on the premise that "HABs are not associated" with "temperature, salinity, nutrients, and other measures of water quality." However, in the same breath, plaintiff acknowledges that "HABs may be influenced by these factors" and that "these factors [are] relevant to the proliferation of HABs." Indeed, in a separate argument in its brief, appellant complains that the EIR should have, but failed to, adequately analyze these very factors. In any event, the EIR determined that turbidity, nutrients, temperature, residence time, and salinity are factors that may lead to the proliferation of HABs, and appellant presents no cogent argument explaining why this determination is unsupported or incorrect.

Petitioner also asserts in passing that the EIR's "analyses of the other factors–temperature, salinity, nutrients–all fail to specifically analyze the project's potential to increase the probability of HABs." This appears to be a rehash of its argument below that although the DEIR discussed individually the relevant factors recognized to lead to HABs—turbidity, nutrients, salinity, temperature, and residence time—it did not also analyze how such factors could contribute to HABs. If this is the argument appellant is attempting to argue on appeal, we, like the trial court, reject it.

It is true that the DEIR's discussions of the project's impacts on the identified factors were not specifically made within the context of HABs. However, the FEIR bridges this analytical gap—it summarizes and incorporates by reference the DEIR's discussions on the project's impacts on the individual factors recognized to lead to HAB formation, and clarifies that the project "will not create conditions that would give rise to HABs with

16

regard to [those] factors . . . that would trigger the emergence and subsequent growth of HABs."[7]  As such, when read together, the DEIR and FEIR *did* analyze the project's potential impact on HABs.

Appellant then asserts the Department "relied on conclusory statements unsupported by data, modeling, or analysis in its determination that the project would have no effect on the emergence and growth of HABs . . . ."  However, as detailed above, the DEIR analyzed each factor recognized to lead to formation of HABs, the FEIR summarized those findings, and based on those findings, the FEIR concluded that the project

---

[7] To the extent appellant argues in its reply brief that the "[i]nformation on HABs belatedly added to the FEIR only underlines [the Department's] failure to adequately inform the public of the project," the argument is forfeited.  Appellant did not raise this argument in its opening brief.  (It only did so with respect to the FEIR's addition of "Appendix X," which addresses the project's impacts on water salinity.)  Accordingly, this newly raised argument was forfeited.  (See *Golden Door Properties, supra,* 50 Cal.App.5th at p. 559.)  But even if not forfeited, the argument is unavailing.  Appellant cites to a case discussing the requirement of recirculation of an EIR to the public upon the addition of "significant new information" to the EIR.  (See *Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 667; see also § 21092.1.)  The Guidelines specify the types of "significant new information" that trigger recirculation.  (Guidelines, § 15088.5, subd. (a)(1)–(4) [These include: "[a] new significant environmental impact"; "[a] substantial increase in the severity of an environmental impact"; the addition of a "feasible project alternative or mitigation measure considerably different from the others previously analyzed"; and a "draft EIR" that is "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."].)  But appellant offers no argument explaining how the FEIR's analysis on HABs or, for that matter, inclusion of Appendix X, falls within any of the specified categories of "significant new information."  In any event, we conclude that neither additional analysis does.

17

would not "create conditions that would give rise to HABs with regard to environmental factors including turbidity, salinity, temperature, or nutrients that would trigger the emergence and subsequent growth of HABs." Such discussions in both the DEIR and FEIR satisfy CEQA's requirement that ' " '[w]here . . . 'the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion.' " (*North Coast Rivers*, *supra*, 216 Cal.App.4th at p. 637; Guidelines, § 15128.)

### *The EIR Adequately Analyzed the Factors Recognized to Lead to Formation of HABs*

Appellant then turns to the individual factors known to contribute to the formation of HABs and argues the EIR did not adequately analyze them.

#### Turbidity

Appellant quotes the portions in the DEIR discussing turbidity and nutrients that we discussed above. It also quotes other portions in the DEIR acknowledging that the project may potentially have an impact on turbidity levels, which in turn may affect fish and agriculture. Then, appellant asserts, in a single sentence, this conclusory argument: "Thus, the EIR should have analyzed the turbidity that would be caused by the project within an actual analysis of HABs formation by the project."

In the first place, appellant's failure to develop this argument allows us to treat it as forfeited. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956; *S.C.*, *supra*, 138 Cal.App.4th at p. 408.) It is also unavailing. The argument is essentially a variation of its earlier argument that the EIR was inadequate because the DEIR did not specifically analyze the project's impact on turbidity (in addition to other factors that contribute to HAB formation) within the context of HABs. We already rejected this argument.

18

### Nutrients

Appellant further contends that the EIR ignores the potential for construction of the project to cause nutrient buildup in the surrounding waters and, in turn, the facilitation of HABs. We agree with the respondents that appellant's argument "simply ignore[s] . . . the record."

As mentioned above, the EIR explained that turbidity "is a measure of the amount of suspended solids within the water column" and "is correlated to the input of nutrients . . . ." The EIR acknowledged that "[n]utrients, primarily nitrogen compounds (N) and phosphorus (P), may trigger excessive growth of algae or toxic blue-green cyanobacteria," and that the "[p]rimary sources of nutrients are erosion, agricultural runoff, urban runoff, and treated effluent." It also acknowledged that "construction activities could expose soils to temporary increased rates of erosion and increase sediment loading to receiving waters," and that "grading, excavation of channels, and breaching levees" could lead to "erosion and sedimentation from the Proposed Project Site through the constructed channels and breaches." The EIR acknowledged that all these activities have the potential to increase turbidity and/or otherwise adversely affect water quality.

However, the EIR determined that during construction, the project would not cause a significant amount of soil or other contaminants to enter surrounding surface water with mitigation measures incorporated. The EIR explained that a National Pollutant Discharge Elimination System (NPDES) Construction General Permit "is required prior to initiating earth disturbing activities to ensure construction activities would not degrade surface groundwater quality." Requirements of the General Permit include implementing Best Management Practices (BMPs) that include: "(1) conducting major construction activities involving excavation and spoils

haulage during the dry season, to the extent possible; (2) use of straw bales, sandbags, gravel traps and filters; (3) erosion control measures such as vegetation and physical stabilization; and (4) sediment control measure such as fences, dams, barriers, berms, traps, and basins." It also requires the Department to "monitor turbidity approximately 500 feet downstream of construction activities" and halt all construction-related, earth-disturbing activities "until sufficient turbidity limits can be met by application of BMPs specified in the NPDES Construction General Permit."

With respect to post-construction activities, the EIR discussed "geotechnical and hydrologic and hydraulic investigation, modeling, and analyses, [which] indicate that the underlying soil provides stable soil conditions that would not be susceptible to erosion from the hydraulic shear stresses on the designed channels and levee breaches," and the understanding that "natural recruitment of emergent marsh vegetation would provide additional stability to soils and dampening of shear stresses."

Furthermore, the EIR noted that current farming practices, which "result in the discharge of excess water collected from onsite irrigation and runoff that contain residual levels of herbicides and pesticides," would end prior to construction of the Project, and this would have a positive influence on water quality by eliminating agricultural inputs.

Considering all of this evidence, the EIR ultimately determined that the "Project will not create conditions that would give rise to HABs with regard to environmental factors including turbidity . . . or nutrients that would trigger the emergence and subsequent growth of HABs." ~ (LOS 162)~

Thus, contrary to appellant's contention, the EIR analyzed the project's impact on nutrient buildup in soils and its resultant impact on the creation of HABs.

20

**Water Temperature**

Appellant also contends the EIR failed to adequately analyze the project's impact on water temperature and the resultant impact on HABs.

*Additional Background*

The DEIR explained that "[b]ringing water onto shallow flats and exposing it to solar radiation has the potential to raise temperatures," but that the water will mix with the adjacent bodies of water, "effectively neutralizing any small increases in temperature due to solar exposure." In addition, "While emergent marsh absorbs more solar radiation than open waters, the presence of vegetation reduces water temperatures." The DEIR determined that "[t]emperature decreases associated with marsh vegetation shading are therefore anticipated to roughly offset or decrease temperature increases associated with solar radiation due to shallow depth. Accordingly, changes to water temperature would be minimal" and, as such, would result in a "less than significant impact." (Italics omitted.) The DEIR cited to two separate scientific studies of two sites in the Suisun Marsh, which is located in the same estuary as the project. These studies explained that both natural and modified sloughs serve as "net temperature sinks," and that this cooling effect is an "important ecosystem service" that results primarily from vegetation shading and the regular mixing of water with adjacent waterbodies.

The FEIR concluded that the data from the sites analyzed in the studies "supports the [DEIR's] finding of a less-than-significant impact relative to the Basin Plan objective of not increasing water temperature." The FEIR further concluded that "the Proposed Project would have minimal effect on water temperature that may influence the presence of HABs."

21

*Analysis*

Appellant argues that the EIR was inadequate because it failed to include certain data, including, for example, a timeline for the vegetation growth anticipated to cool water temperature. Appellant seems to suggest the additional data was necessary based on its assumption that during the time of revegetation "the temperature increases in the water would continue unabated." However, appellant does not provide any citation to the record to support this assumption.

Appellant's unsupported assumption actually contradicts the findings of the EIR. As mentioned, the EIR explained that the "predominant plant species anticipated to colonize the site are tule . . . and cattail," and that both species "reproduce prolifically from seed dispersal," which is abundant in the area. The EIR also noted that even before this vegetation matures, "tidal exchange would move large volumes of water into and out of the area, effectively neutralizing any small increases in temperature due to solar exposure." Additionally, as noted above, the EIR stated that the scientific studies demonstrated that both long-term and emergent marshes would reduce surrounding water temperatures. To the extent appellant contends otherwise (again, without citation to any evidence), its argument amounts to a mere disagreement with the EIR, and "mere disagreement is insufficient" to establish the EIR was inadequate. (*North Coast Rivers*, *supra*, 216 Cal.App.4th at p. 653.)

Moreover, even if the inclusion of additional data in the EIR may have been helpful, this does not render the EIR inadequate. As respondents note, under CEQA "[i]t is 'not necessary that the analysis be so exhaustively detailed as to include every conceivable study or permutation of the data. [Citations]." (*League to Save Lake Tahoe v. County of Placer* (2022) 75

22

Cal.App.5th 63, 139 (*Save Lake Tahoe*); accord, *Tiburon Open Space, supra,* 78 Cal.App.5th at p. 726.) "A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not, for them to design the EIR. That further study [ ] might be helpful does not make it necessary." (*Laurel Heights, supra,* 47 Cal.3d at p. 415.) Rather, CEQA only " 'requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. (Guidelines, § 15151.)' " (*Save Lake Tahoe, supra,* 75 Cal.App.5th at p. 140.) We agree with respondents that the EIR's discussion on the project's impacts on water temperature and in turn HABs, which we described at length above, meets this standard.

### Residence Times

Appellant argues that the EIR's analysis on the project's potential to increase water residence times was flawed.

### *Additional Background*

As described in the DEIR, residence time, or exposure time, refers to the "total amount of time a particle spends inside" a given location or condition, such as the waters located in the project area. Exposure time on the project site "is largely governed by the location and orientation of levee breaches around the perimeter of the site." The DEIR noted that "[l]onger exposure times are generally considered good" to increase productivity of biomass (organic detritus, phytoplankton, zooplankton, etc.), which may be beneficial for "aquatic food web productivity," a goal of the project. At the same time, "[l]onger exposure times also have the potential to produce [HABs]."

The DEIR relied on hydraulic modeling, a process that simulated and analyzed water flow and particle transport in the project area. Results of the

hydraulic modeling for exposure times were described in Appendix P to the DEIR and depicted in a diagram (Figure 19) therein. Appendix P stated, "In general, the Project is able to realize a broad range of exposure times across the site." And as summarized in DEIR, the modeling results "indicate[d] that residence time of water within the majority of the Proposed Project Site would range between one and 14 days."

The FEIR referred back to the modeling, which it noted was "used to predict how long water remained within the Proposed Project Site and adjacent waterways." The FEIR stated that "[m]uch of the area within and adjacent to the Proposed Project site was found to have water residence times of a week or more."

Also, in response to public comments criticizing the EIR's analysis regarding HABs, the FEIR acknowledged that "the emergence of increased concentrations of HABs is indicative of potential problems with water stagnation." However, the FEIR explained that the project "would reintroduce tidal influence to the Project Site, reducing water stagnation."

### Analysis

Appellant argues that the EIR "provides conflicting statements, inconsistent data, and incongruous conclusions regarding residence time . . . ." In particular, appellant notes that the DEIR stated that based on the hydraulic modeling, "residence time of water within the majority of the Proposed Project Site would range between one and 14 days," whereas the FEIR stated that "[m]uch of the area within and adjacent to the Proposed Project site was found to have water residence times of a week or more." The FEIR did not explain the difference between its summary of the modeling results and that of the DEIR. Figure 19 in Appendix P to the DEIR showed the exposure time for various areas within the project site. Exposure times

24

were broken down into the following ranges of days:  1 to 3; 3 to 5; 5 to 7; 7 to 14; 14 to 25; and 25 or more.  Each range was assigned a different color.  Based on a visual review of the diagram, it appears that the colors that comprise a "majority" or "much" of the project area are those assigned to either 7 to 14 days, 14 to 25 days, or 25 days or more.  The remaining portions appear to fall within the ranges of either 1 to 3 days, 3 to 5 days, and 5 to 7 days.  Thus, the DEIR's use of the word "majority" when it stated that "residence time of water within the majority of the Proposed Project Site would range between one and 14 days" was not the most precise.  Rather, it appears that the FEIR's statement that "[m]uch of the area . . . was found to have water residence times of a week or more" was the more precise description.  To the extent the DEIR's description of the modeling results was imprecise or mistaken, we infer that the FEIR corrected it.  (See *Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 727 [we " ' must indulge all reasonable inferences from the evidence that would support the agency's determinations' "].)  And appellant does not point to anything in CEQA that prohibits the FEIR from doing so.

Appellant next contends that "the methodology used to analyze particle movement and residence times . . . . was insufficient," because it "dr[ew] on data produced at monitoring stations located outside the project area."  "Challenges to the scope of the analysis, the methodology for studying an impact, and the reliability or accuracy of the data present factual issues, so such challenges must be rejected if substantial evidence supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 (*Federation of Hillside*); accord, *Tiburon Open Space*, *supra*, 78 Cal.App.5th at p. 728.)  Further, "the issue is

not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered as part of the total evidence that supports the [agency's] finding[s]. . . ." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 409, italics omitted.) A party challenging a particular study must show that it is "clearly inadequate or unsupported." (*Id.* at p. 409, fn. 12.)

Here, appellant asserts in conclusory fashion that relying on data outside of the project area rendering the project's modeling "insufficient." By failing to meaningfully articulate this argument, appellant not only has forfeited this argument (*S.C.*, *supra*, 138 Cal.App.4th at p. 408; *Cahill*, *supra*, 194 Cal.App.4th at p. 956), but also has failed to show that the modeling upon which the EIR was based was "clearly inadequate and unsupported." To the contrary, the EIR's decision to use data based on waterways located outside of the project area in its modeling to evaluate the project's impact on residence times is supported by substantial evidence.

Appellant further argues that "[e]xpert comments and other substantial evidence support the claim that the new inlets would be a place where HABs would occur." Appellant then cites to a report that was attached to, and cited in, one of the comment letters. The report states, "With continued climate change and global warming, there's an increased risk that cyanoHABs will become increasingly competitive vis-à-vis diatoms which often dominate community composition in temperate regions"; that "water temperature. . . [is] closely linked" to "stratification and water column stability"; and that "[t]his allows for faster growth rates and longer residence times in the top layer of the water column, which allow HABs to proliferate." Appellant apparently contends that the EIR failed to address this conflicting

26

expert opinion.[8]

Not so. The EIR included and summarized the main points of the comments challenging the analysis on HABs, including with respect to residence times. After considering these comments, the Department responded by acknowledging that water temperature and residence times, among other factors, could potentially contribute to the growth of HABs. However, it determined that the project would not create a significant impact on either water temperature or residence times and, therefore, HABs, and set forth its reasons why.

To the extent appellant disputes this conclusion on its merits, "[d]isagreement among experts does not make an EIR inadequate," as appellant acknowledges. (*Tiburon Open Space, supra*, 78 Cal.App.5th at p. 726.) As such, the Department was free to disagree with the expert comments and reports, and appellant does not demonstrate otherwise. In short, "the disagreement about the merits [of the project's impact on residence times and their resultant effect on HABs] is simply the type of disagreement among experts that is not unusual and does not make an EIR inadequate." (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 355.)[9]

---

[8] Respondents argue that appellant forfeited this argument by not raising it in the trial court. In its reply brief, appellant points to portions in the record, including argument from counsel at the hearing on the appellant, to show it preserved the issue for appeal. Assuming without deciding appellant did not forfeit its contention, we reject it on the merits for the reasons explained in the text.

[9] Appellant also recounts a discussion in the FEIR stating that the DEIR did not include an analysis of the project's effect on dissolved organic carbon (DOC) " 'because there is no regulatory standard to form a significant threshold to determine effects on DOC levels"; that the Department nonetheless reconsidered the issue based on several comments regarding

27

### *The EIR Analyzed the Project's Cumulative Impact on HABs*

Lastly on HABs, appellant argues that "the EIR fails to mention" the project's cumulative impacts on the formation of HABs.  This completely ignores the record.

Under CEQA, " '[c]umulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.)  The Guidelines define "[t]he cumulative impact from several projects" as "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (*Id.*, subd. (b).)  CEQA requires an EIR to discuss cumulative impacts when two conditions are present:  (1) the combined impact of the project and other projects is significant, and (2) the project's incremental contribution to the combined impact is "cumulatively considerable." (Guidelines, § 15130, subd. (a), (a)(2).)  "CEQA requires an EIR to discuss no cumulative impacts . . ." analysis in the EIR if the combined impact is not significant or "the project's incremental contribution to the impact is 'cumulatively considerable.' " (*Save Lake Tahoe*, *supra*, 75 Cal.App.5th at p. 148.)  "If the lead agency finds either that the combined

———————————

DOC; and that the Department concluded the project would not raise DOC and affect the quality of water treated at water treatment plants for specified reasons and that no additional analysis was required.  Aside from mentioning the existence of this discussion in its opening brief, appellant does not make any express legal argument challenging it.  Appellant subsequently develops an argument in its reply brief that "the DEIR's discussion of DOC is relevant to residence time, and HABs formation, which the DEIR should have disclosed."  This contention is forfeited because appellant did not raise it in its opening brief.  (See *Golden Door, supra,* 50 Cal.App.5th at p. 559.)

impact is insignificant or the project's contribution is not cumulatively considerable, the EIR must briefly explain the basis for the agency's finding and, where the impact is found to be insignificant, identify facts and analysis supporting the agency's conclusion. (Guidelines, § 15130, subd. (a), (a)(2).)" (*Save Lake Tahoe*, at p. 148.)

Here, contrary to appellant's contention, the EIR expressly determined that the project "would not have a cumulatively considerable contribution to cumulative water quality effects, including the proliferation of HABs." This determination was based on the EIR's analysis that the project is "expected to have a positive influence on water quality by eliminating agricultural inputs and by reducing stagnant water that contributed to the proliferation of HABs . . . ." The EIR explained: "Current farming practices, under baseline conditions, use pesticides and fertilizers that can contribute residual levels of chemicals in irrigation and other site runoff which can adversely affect receiving water quality. Such practices would end prior to construction of the Proposed Project, decreasing potential inputs that might contribute to water quality issues over time as part of the cumulative scenario. Additionally, the emergence of increased concentrations of HABs is indicative of potential problems with water stagnation. The Proposed Project would reintroduce tidal influence to the Project Site, reducing water stagnation." This brief explanation identifying the facts and analysis supporting the Department's determination that the project's cumulative impact on HABs would be less than significant is sufficient to satisfy CEQA's requirements. (See Guidelines, § 15130, subds. (a), (a)(2); *Save Lake Tahoe*, *supra*, 75 Cal.App.5th at p. 148.)

**Salinity**

### *The Modeling Used to Evaluate the Project's Impacts on Salinity Is Supported By Substantial Evidence*

Moving on to salinity, appellant argues that the modeling approach used in the EIR to evaluate the project's impacts on salinity levels was flawed.

### Additional Background

The DEIR recognized that tidal wetland restoration could alter the salinity in the Delta, which in turn could negatively impact drinking water quality, fish and wildlife, and agriculture. It analyzed the potential impacts of the project on salinity by using a modeling scenario based on the year 2009, which was representative of typical dry year conditions. The model simulated the flows in the San Francisco Bay and Delta region that were "driven by ocean tides, riverine inputs, and water diversions." The model then used these flows to predict the distribution of electrical conductivity, a surrogate for salinity. In turn, the model compared electrical conductivity in a scenario based on existing conditions with a scenario based on project conditions. By doing so, the modeling provided "a quantitative evaluation of the salinity changes." Based on the modeling results, the DEIR concluded the project's impacts on salinity would be less than significant.

The Department received comments requesting consideration of a wider range of hydrologic conditions, such as critical dry year conditions or continuous multi-year analysis of more than a decade. The FEIR responded to these comments, stating that the modeling was revised to improve its predictions in the vicinity of the project. Specifically, it expanded its data range to include the years 2010 and 2016 in addition to 2009. "These periods cover a dry year hydrology (2009) and a below normal year hydrology (2010) as well as a below normal year hydrology following four years of dry to

30

critically dry conditions (2016)."  These "[p]eriods were selected to reflect some of the historical salinity variation, including yearly and seasonal fluctuations in the dynamic Bay-Delta System."  The revised modeling's predictions replicated 90% or more of the variance in observed electrical conductivity (i.e., salinity) at most locations, and 67% to 80% at other locations, which was still considered "a high correlation."  And in these latter areas where the model was slightly less accurate, the FEIR discussed in detail why this was so.  Ultimately, the FEIR noted that the revised modeling and additional analysis did not change its earlier conclusion that the project's impacts on salinity would be less than significant.

**Analysis**

Appellant argues that "The FEIR's insistence that modeling two additional years, neither of which represents drier conditions than the one year modeled in the DEIR, represents a 'reasonable variety of hydrologic conditions sufficient to analyze potential salinity impacts' (citation) is not convincing."  "[T]he two additional years," appellant asserts, "increase[d] the range of conditions analyzed only by adding below normal conditions to the model, and do not represent any additional hydrological conditions, such as those present in critically dry years."  And so, appellant maintains that the Department "cherry picked a small subset of the period of record for its salinity modeling . . . ."[10]

As explained above, "challenges to the . . . methodology for studying an impact[] and the reliability or accuracy of the data present factual issues, so

---

[10] Respondents contend that appellant never raised this argument in the trial court and thus forfeited the argument on appeal.  In its reply brief, appellant argues that it raised the argument, pointing to certain excerpts in its pleadings below.  We need not decide forfeiture, because assuming appellant preserved the claim for appeal, it fails on the merits.

such challenges must be rejected if substantial evidence supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported." (*Federation of Hillside, supra*, 83 Cal.App.4th at p. 1259.) Appellant has the burden to show that the EIR's methodology was "clearly inadequate or unsupported." (*Laurel Heights, supra*, 47 Cal.3d at p. 409, fn. 12.) Appellant has not met this burden.

Initially, appellant's characterization of the revised modeling as analyzing "the same or similar conditions" as that used in the original modeling is inaccurate. As shown in the EIR, the types of water years include wet, normal, below normal, dry, and critically dry. In 2009, the year upon which the initial modeling was based, represented typical dry conditions. The revised modeling additionally analyzed the years 2010 and 2016, with 2010 representing "below normal year hydrology" and 2016 representing "below normal year hydrology following four years of dry to critically dry conditions . . . ." The EIR explained that these "[p]eriods were selected to reflect some of the historical salinity variation, including yearly and seasonal fluctuations in the dynamic Bay-Delta System." In particular, "The modeled years all occur as part of multi-year droughts . . . : 2009 is the second year, 2010 the third year, and 2016 is the fifth year of consecutive drought years. The modeled years include conditions when reservoir storage was depleted and less water was available for salinity management." This discussion, contrary to appellant's assertion, reflects that the Department analyzed a varied range of water years and conditions beyond just one typical dry year in 2009.

To the extent appellant complains the EIR was inadequate for failing to specifically analyze a critical dry year, such contention does not compel reversal. Appellant has not established that the Department was required to

32

utilize any specific subset of data to calibrate its salinity modeling.  Further, the issue is not whether the modeling was irrefutable or could have been better.  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 409.)  Here, considering the EIR's discussion as to why it selected the years 2009, 2010, and 2016 for its revised modeling, we conclude that its choice of methodology to analyze impacts on salinity is supported by substantial evidence.  And appellant has not met its burden to establish that the EIR's salinity modeling approach was "clearly inadequate or unsupported."  (*Id.* at p. 409, fn. 12.)

### *The EIR's Reliance on D-1641 As a Threshold of Significance of the Project's Individual Impact on Salinity Was Not an Abuse of Discretion*

Appellant next challenges the EIR's use of the standards of the State Resources Board's Decision 1641 (D-1641) as the threshold to evaluate the severity of the project's impact on salinity.

### **Additional Background**

Appendix G of the Guidelines provides an "Environmental Checklist Form" that may be used in determining whether a project could have a significant effect on the environment and whether it is necessary to prepare a negative declaration or an EIR.  (Guidelines, Appendix G:  Environmental Checklist Form (Appendix G); see *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896, fn. 5; Guidelines, § 15063, subd. (f).)  The checklist consists of sample questions divided into categories of potential physical impacts a project may have, including impacts on "Hydrology [and] Water Quality."  (Guidelines, Appendix G.)  For example, the first question in the "Hydrology [and] Water Quality" category is "Would the project . . . [v]iolate any water quality standards or waste discharge

33

requirements or otherwise substantially degrade surface or ground water quality?" (*Ibid.*)

The EIR stated that it used the questions in Appendix G as a threshold to determine the significance of the project's impacts on salinity, stating in particular that "the most important significance criteria" included the first question in the "Hydrology [and] Water Quality" category quoted above. It then explained that "the determination of whether a change is considered 'significant' depends on whether there would be an exceedance of a standard set forth in [D-1641]." The EIR added that D-1641 "is considered the relevant water quality standards to assess salinity impacts."

D-1641 is the State Water Resources Control Board's water rights decision that largely implements the 1995 Bay-Delta Water Quality Control Plan's (Bay-Delta Plan) comprehensive management package for salinity in the region. D-1641 implements flow and water quality objectives throughout the Delta that are established to protect recognized beneficial uses, including drinking water quality, agriculture, and fish and wildlife. D1641's flow and water quality objectives must be measured at various compliance monitoring stations throughout the Delta. The DEIR concluded that, based on the results of the above-discussed salinity modeling at specific monitoring stations established by D-1641, the project's impact on salinity would not exceed D-1641 standards.

A commenter asserted that the DEIR's "discussion of salinity impacts ignores the reality that incremental increases in irrigation water salinity can build up in Delta soils and impair agricultural productivity." The commenter cited to a document entitled, rebuttal "Testimony of Michelle Leinfelder-Miles," which we discuss in greater detail below. The commenter added that "[r]eliance on D-1641 alone precludes full analysis of cumulative salinity

34

impacts, which are potentially significant."

In response, the FEIR noted: "Several comments expressed concerns that increases in irrigation water salinity can build up in Delta soils, damage crops, and impair agricultural productivity. As discussed above, the potential for salinity changes in the Delta channels, from which surface water is diverted for agriculture, has been analyzed for the Proposed Project conditions, and the modeling indicates no change in compliance with D-1641 . . . standards. In addition to the salinity of the diverted water, salinity build-up in soils is also a function of water management (e.g., timing of diversions during low tides) and soil characteristics of a particular site, which is not related to the Proposed Project."

In addition, the FEIR explained that "[w]hile the cumulative effect of regional restoration with or without the Proposed Project results in small salinity increases in some portions of the Delta [citation], these increases do not result in salinity levels that are in non-compliance due to the Proposed Project or are substantially more likely to cause D-1641 non-compliance for agriculture, fish and wildlife, or municipal beneficial uses." "Cumulative impacts, therefore, would not be significant because they would not result in any additional water quality degradation that would cause any of the locations to approach D-1641 non-compliance for agriculture, fish and wildlife, or municipal drinking water beneficial use."

**Analysis**

"A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect normally will be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a).)

"Such thresholds can be drawn from existing environmental standards, such as other statutes or regulations." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 111, overruled on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.) "The lead agency has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact. (See . . . Guidelines, § 15064, subd. (b); *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068; *Lotus* [*v. Department of Transportation* (2013)] . . . 223 Cal.App.4th [645,] 655, fn. 7 [' "The standard of significance applicable in any instance is a matter of discretion exercised by the public agency " 'depending on the nature of the area affected.' " '].)" (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 184 (*Mission Bay Alliance*).)

Here, as discussed above, the EIR relied on the salinity standards in D-1641 as a threshold of significance for both the project's individual and cumulative impacts on salinity. Initially, we note that appellant raises separate challenges to the EIR's reliance on D-1641, first with respect to its evaluation of the significance of the project's individual impacts on salinity, and then with respect to the cumulative impacts on salinity. We start with the first argument, and address the second argument in the next section.

Appellant asserts that the EIR ignores "impacts that may still significantly affect water quality and water users, even when quality remains below a regulatory standard, such as those in . . . D-1641."

As we understand it, appellant's argument appears to invoke the principles in *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 (*Protect Waterways*), which it cited several paragraphs earlier in its brief. Appellant relied on *Protect Waterways* for the

proposition that "the agency must consider and resolve every fair argument that can be made about the possible significant environmental effects on a project, irrespective of whether an established threshold of significance has been met with respect to any given effect." (*Id.* at pp. 1111–1112.) If appellant is arguing that the EIR's application of D-1641 as a threshold of significance improperly foreclosed its consideration "of other substantial evidence tending to show" a fair argument that the project would have a significant impact on salinity, such argument is unavailing.[11] (*Id.* at p. 1109.)

"The [appellant] bears the burden of proof to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 886.) " ' "Substantial evidence" means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] Substantial evidence "shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." [Citation.] "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of

---

[11] In a separate argument challenging the EIR's reliance on D-1641 as a threshold to evaluate significance of the project's *cumulative* impacts on salinity, appellant asserts more explicitly what it suggests implicitly in the present argument concerning the *individual* impact on salinity. Namely, appellant asserts that the Department "ignored its duty to consider every issue for which the record contains substantial evidence supporting a 'fair argument' that a project may have a significant effect on the environment" and that "the record contains ample evidence to support a fair argument that the project would contribute to the cumulative impact of salt built up in the soils of the Delta, and this buildup may reduce crop productivity." As discussed below, we reject that argument for the same reasons we reject the present argument.

social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." ' " (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 781 (*Newtown Preservation*).)

According to appellant, "[s]ubstantial evidence in the record shows that creating conditions that further constrain farmers' choice of crops, or that reduce crop yields, is a significant impact that is reasonably foreseeable despite compliance with D-1641 salinity standards." We disagree.

Regarding the constraint to "farmers' choice of crops," appellant relies on public comments including, for example, one that states, "farmers in the Delta choose crop types and irrigation practices based on their expectation of salinities; in the North Delta, for instance, crops grown are targeted for salinity levels well below the agricultural EC and urban chloride concentrations standards in D-1641." Initially, appellant fails to explain how farmers' potential lack of access to water with less salinity than they would receive if D-1641 standards are met—again, standards designed to "protect agricultural beneficial uses"—would still constitute a significant impact to the environment. As the Department notes, "Delta farmers may perpetually wish for less saline waters, but that does not mean the Project . . . will have any significant effect on their efforts." (Cf. *States Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 744 ["[Appellants] have not shown that [agricultural] water users have any right to water with less salinity than they will receive if [D-1641 salinity] objectives are met."].) In any event, the public comments cited by appellant hardly constitute substantial evidence to support a fair argument of a significant impact, as they are themselves conclusory and unsubstantiated with citation to supporting facts. (See, e.g., *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161,

194 ["conclusory, speculative, or otherwise unsupported" comments are insufficient to support a fair argument of significant impact].)

As for its argument that the project would "reduce crop yields," appellant primarily relies on the written testimony Dr. Leinfelder-Miles that was attached to and cited in a comment letter. As quoted by appellant, Dr. Leinfelder-Miles stated that "[i]ncreases in applied water salinity may injure Delta agricultural systems by degrading soil conditions or decreasing yield. Unleached salts have the potential to injure current crops and future cropping." However, as the trial court observed, and appellant acknowledges, this testimony was "pulled from another case," and thus did "not address anything specific about this Project or the Project site." Nor did the testimony "address the D-1641 standard," much less establish "that D-1641 is an improper threshold of significance to determine impacts on agriculture." As such, appellant has not demonstrated that Dr. Leinfelder-Miles's statements are substantial evidence supporting a fair argument that *the project* may have a potentially significant effect on the environment, despite compliance with D-1641. (Cf. *Newtown Preservation*, *supra*, 65 Cal.App.5th at p. 789 [comments relied upon were not substantial evidence of a fair argument because the "statements relate to how existing wildfire hazards might impact residents during the project's construction and do not support a fair argument that *the project* may have a potentially significant effect on the environment or may exacerbate existing environmental hazards"].)[12]

---

[12] Despite acknowledging the trial court's finding that the testimony did not undermine the EIR's use of D-1641, appellant makes no effort to refute this finding or otherwise establish that the testimony is relevant to the project. Appellant only does so in connection with a separate argument concerning the reliance on D-1641 as a threshold of significance of the project's *cumulative* impacts on salinity. Specifically, appellant asserts "[t]he

39

Even putting aside the fact that the testimony did not mention the project or D-1641 standards, we are still unpersuaded that appellant presented a fair argument based on substantial evidence. Appellant cites to Dr. Leinfelder-Miles's testimony that "[t]he salinity of water in surface waterways is not an accurate representation of what the crop takes up. Additionally, monthly averages of salinity in surface waterways do not accurately represent what the crop takes up. Monthly averages of surface waterway salinity should not be used as a substitute for the seasonal average applied water salinity to a field." And appellant suggests that the D-1641 standards are based on these purportedly improper monthly averages of surface water salinity. But while Dr. Leinfelder testified that "monthly averages of surface waterway salinity should not be used," she did not articulate the basis of this opinion. And "[m]ere argument, speculation or unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument." (*Newtown Preservation*, *supra*, 65 Cal.App.5th at p. 785.)

Therefore, appellant has failed to establish that the EIR's reliance on D-1641 as a threshold to measure the project's individual impact on salinity was an abuse of discretion.

---

fact that Dr. Leinfelder-Miles'[s] testimony came from a different proceeding or that it did not specifically address D-1641 standards is immaterial" and "[h]er testimony . . . is equally applicable to the project here." It is unclear why appellant would raise this argument only with respect to the project's cumulative, and not individual, impacts on salinity. But assuming the argument applies to both types of impacts, the argument is unaccompanied by cogent analysis. In any event, as we conclude in the text, the testimony of Dr. Leinfelder-Miles does not supply substantial evidence supporting a fair argument that the project would have a significant impact on salinity, individually or cumulatively, despite compliance with D-1641.

***The EIR's Reliance on D-1641 As a Threshold of Significance
Of the Cumulative Impact on Salinity Was Not an Abuse of
Discretion***

Appellant also argues that the chosen threshold used to evaluate the project's cumulative impact on salinity, D-1641, was inadequate. Appellant contends the Department "ignored its duty to consider every issue for which the record contains substantial evidence supporting a 'fair argument' that a project may have a significant effect on the environment. [Citation.] As discussed above, compliance with regulatory standards alone is not by itself evidence that an impact will not be significant. [¶] Here, the record contains ample evidence to support a fair argument that the project would contribute to the cumulative impact of salt built up in the soils of the Delta, and this buildup may reduce crop productivity." Appellant then cites Dr. Leinfelder-Miles's testimony and argues that it "specifically refuted the claim by [the Department] that less than 5% is automatically not an impact . . . ." Appellant also notes, as it did before, that "[h]er testimony described the problems inherent in methods that consider only the monthly averages or water salinity . . . ."

This is essentially a more fleshed out version of appellant's earlier challenge to the use of D-1641 as a threshold of significance for the project's individual impacts on salinity. For the same reasons stated above, we conclude appellant fails to provide substantial evidence supporting a fair argument that the project may have a cumulatively significant effect on the environment, despite compliance with D-1641.

Furthermore, appellant's attempt to analogize the EIR to that in *Protect Waterways* is unconvincing. In that case, the EIR was inadequate because its standards of significance did not address one of the environmental effects the project would have and it failed to explain its

significance conclusion. (*Protect Waterways*, *supra*, 116 Ca.App.4th at pp. 1111–1112.) Here, in contrast, the EIR's threshold of significance addressed the environmental effect at issue (salinity) and the EIR set forth in detail its reasons for concluding the project's impacts would not exceed that threshold.

In sum, appellant's challenge to the EIR's reliance on D-1641 as a threshold to measure the project's individual impact on salinity is without merit.

**Water Quality**

Finally, appellant argues that the EIR's analysis on the impact on water quality was inadequate. It argues that "the EIR's findings regarding impacts to water quality fails to support with substantial evidence the conclusions that all water quality impacts will be less than significant with mitigation . . . . The mitigation offered by DWR fails entirely to mitigate for impacts to water quality that the project is likely to cause after construction of the project, as the referenced measures address only impacts during construction. Moreover, the findings fail entirely to address the substantial evidence in the Record of a fair argument of significant effects from increased HABs and increased salinity, in violation of CEQA."

We have already rejected the last argument. And appellant's "mitigation" argument is unavailing. The only significant impact to water quality that the EIR identifies is that *during* construction, "Project constructive activities could result in substantial degradation of surface or groundwater quality." However, the EIR determination that with mitigation measures, this impact would be less than significant. But beyond this potentially significant impact, the EIR found that *postconstruction* activities would result in a less than significant impact on water quality, including with regard to HABs, increased salinity, agriculture, drinking water, and fish

and wildlife.  Since "[m]itigation measures are not required for effects which are not found to be significant" (Guidelines, § 15126.4, subd. (a)(3)), any suggestion that the EIR was inadequate for failing to include mitigation measures for post-construction impacts on water quality fails.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

_____

RICHMAN, J.

We concur.

_____

STEWART,  P.J.

_____

MILLER, J.

(A167384)